# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

THOMAS SANDS, BENJAMIN GALLUCIO AND LOGAN KENNEY )
)
)
Plaintiff, )
)
v. )
)
HOMESTAR REMODELING, LLC, )
)
Defendants. )

C.A. No.: N21C-02-008 FJJ

Submitted: October 2, 2025
Decided: October 14, 2025

## DECISION AFTER TRIAL

*Michael Ippoliti, Esquire,* Ippoliti Law Group, Wilmington, Delaware, Attorneys for Plaintiff.

*Michael DeSantis, Esquire and Anthony Delcollo, Esquire*, Offit, Kurman, Wilmington, Delaware, Attorneys for Defendant

**Jones, J.**

Plaintiffs, Thomas Sands ("Sands"), Benjamin Galluccio ("Gallucio") and Logan Kenney ("Kenney") are former employees of the Defendant Homestar Remodeling, LLC ("Homestar"). Each Plaintiff brings claims against Homestar relating to their compensation while employed by Homestar. Plaintiffs allege that Homestar (1) violated the Delaware Wage Payment and Collection Act; (2) violated the Fair Labor Standards Act; (3) breached its contracts with Plaintiffs; (4) violated Delaware's Minimum Wage Act; (4) engaged in fraud and/or misrepresentation; (5) breached the duty of good faith and fair dealing; and (6) was unjustly enriched. A three-day bench trial was held the week of November 12, 2024.[1] Post trial submissions were completed on.[2] This is the Court's trial decision.

## PLAINTIFF'S MOTION IN LIMINE REGARDING SPOLIATION

During the course of discovery, Defendant produced 126 pages of discovery in response to a request for production from Plaintiffs. Plaintiffs say that Defendants did not produce, *inter alia*: (1) any portion of a personnel or employment file, including, but not limited to, a resume, job application, job description, wage or salary information, attendance records, attendance reports, performance evaluations, or complete paycheck stubs for any of the plaintiffs, or

---

[1] Docket Item ("D.I.") 70.
[2] D.I. 86, XX.

2

(2) any actual time (or hour) records for any of the Plaintiffs, or (3) any email or text communication, with the exception of 6 responses.[3] In light of this limited production, Plaintiffs maintain that they are entitled to a spoliation instruction and a finding that the Defendant is liable to the Plaintiffs.[4] This request was initially made in a Motion in Limine filed on October 8, 2024 where the Plaintiff moved to preclude Defendant from introducing, discussing or referencing any documents not produced in discovery.[5] In addition to seeking preclusion, Plaintiffs requested that this court conclude that the defendant "spoiled" the evidence and that the Court make adverse inferences against the Defendant and impose liability against the Defendant based on the Defendant's failure to produce these records.[6] As the case was a bench trial, the Court ruled that it would hear the trial testimony and make an appropriate ruling on the motion post-trial.[7]

I deny the Motion for two reasons. First, Defendant did not attempt to introduce any documentary evidence that was not produced during discovery. Second, Plaintiffs Motion comes too late and without a proper foundation.

In their Motion, Plaintiffs point out that the responses to their initial discovery requests were served on March 4, 2022 and that they served a deficiency

---

[3] D.I. 86 p.78.
[4] *Id.* p.84.
[5] D.I. 58.
[6] D.I. 86 p.82-84.
[7] D.I. 64.

notice on Defendants on July 5, 2022.[8] Defendants subsequently responded to these deficiencies. At that point, Plaintiffs took no further action to compel discovery requests until the Motion in Limine was filed. In *Christian v. Counseling Resource Associates Inc.*,[9] the Delaware Supreme Court had occasion to address a party's failure to diligently bring discovery violations to the Court's attention. In *Christian*, the Court wrote:

> ***To avoid this problem in the future, we now advise litigants that, if they act without court approval, they do so at their own risk. If one party misses a discovery deadline, opposing counsel will have two choices – resolve the matter informally or promptly notify the court.*** If counsel contacts the court, that contact can take the form of a motion to compel, a proposal to amend the scheduling order, or a request to conference. Any one of these approaches will alert the trial court to the fact that discovery is not proceeding smoothly. With that knowledge, the trial court will be able to take whatever steps are necessary to resolve the problem in a timely fashion.
>
> ***If the party chooses not to involve the court, that party will be deemed to have waived the right to contest any late filings by opposing counsel from that time forward. There will be no motions to compel, motions for sanctions, motions to preclude evidence, or motions to continue the trial. It is entirely possible, under this scenario, that some vital discovery will not be produced until the day before the trial. Still, the party prejudiced by the delay accepts that risk by failing to promptly alert the trial court when the first discovery deadline passes.***[10]

The instant situation is akin to *Christian*. Plaintiffs request the Court to draw adverse inferences due to an alleged discovery violation, but Plaintiffs took action

---

[8] D.I. 58 p.2.
[9] 60 A.3d 1083 (Del. 2013).
[10] *Id.* at 1087-88 (emphasis in original).

4

during the discovery process to seek a remedy from the Court.  For this reason, and because the Defendant did not introduce any exhibits not produced in discovery, the Court denies Plaintiffs' request to impose liability on the Defendant.

But that is not entirely the end of the matter.  A thrust of Plaintiffs' case is that federal and state law required the Defendant to keep written records of the hours actually worked by the Plaintiffs.  As explained herein, there is no dispute that the Defendant did not keep track of the Plaintiffs' hours.  In assessing the question of how many hours Plaintiffs worked per week and whether they worked weekends and/or trade shows, the Court has considered the testimony of the Plaintiffs and the lack of records of the Defendants to reach the factual conclusions it has reached on these issues.  As the parties will see, *infra*, the Court has accepted the testimony of the Plaintiffs on the average number of hours they worked per week and whether they worked weekends and/or trade shows in large part because of the testimony of the Plaintiffs and the lack of records to support Defendant's position as articulated by the Defendant's witnesses on this point.

## STATEMENT OF FACTS

Each Plaintiff testified at trial.[11]  Homestar called its two principles, Anton Ladden and Daniel Jaffe.[12]  Homestar also called Cori Whittaker,[13] its payroll

---

[11] D.I. 80, 81.
[12] D.I. 78, 81.
[13] D.I. 81.

supervisor, and Janelle Wiser,[14] Plaintiffs' coworker who supervised both Galluccio and Kenney.[15] Each party submitted exhibits.[16]

Based on the evidence presented, the Court finds that the following facts have been proven by a preponderance of the evidence.

Homestar is a home renovation business dealing primarily in windows, roof, and siding.[17] Homestar hires canvassers whose job is to venture into residential neighborhoods and go door-to-door to get homeowners to have Homestar do estimates for the services they provide in the hopes that the homeowner will eventually sign a contract with Homestar for Homestar to do the work.[18] Homestar uses Indeed as one of its platforms to secure canvassers.[19] During the interview process with each potential canvasser, the Homestar representative who is interviewing the prospective employee describes to the employee the compensation plan.[20] The compensation plan during the relevant time frame provided for a daily base pay.[21] The daily base pay could go anywhere from $85 per day to $120 a day depending on the number of leads[22] and estimates[23] that were

---

[14] D.I. 79.
[15] D.I. 81
[16] *See* D.I. 70.
[17] *See* D.I. 80 p. 241:18-242:2.
[18] *See* D.I. 78 p. 9-18; D.I. 80 p. 38:9-14; 242:3-13.
[19] D.I. 81 p. 146:10-22.
[20] D.I. 78 p. 34:6-10; D.I. 81 p.194:16-195:1; 200:11-21; 244:1-11.
[21] *See* D.I. 78 p. 11:5-10; D.I. 81 92:10-14. *See also* Defendant's Exs. 1,5.
[22] Leads are defined as getting a customer to agree to schedule an appointment for an estimate. *See* D.I. 81 p.139:1-3; 154:9-15.
[23] Estimates involved sending a sales representative to a house to give a presentation and pricing. Estimates either lead to a sale or a no sale. D.I. 81 p. 154:16-155:3.

secured during the week.[24]  The minimum base pay was $85 per day.[25]  Employees could earn commissions based on the leads, estimates and sales secured.[26]  If the leads, estimates, or sales generated led to a higher rate of pay for a particular week the employee earned this higher rate.[27]  If the employee's commission did not generate income above the base pay the employee would receive the daily base pay.[28]  In each interview, a paytracker sheet was used by Homestar employees to explain the compensation plan to prospective employees.[29]  The prospective employee was given the paytracker sheet.[30]

Once hired, the employee was required to undergo training.[31]  The training period ran anywhere from one to two weeks and included training in the field where the employee was shadowed by a more experienced canvasser.[32] Employees also had an orientation on their first day.[33]  During orientation, the compensation plan was once again explained to the employee using the paytracker.[34]

---

[24] *Id.* p. 271.
[25] *Id.* p. 271:22-23.
[26] D.I. 80 p. 38:2-5.
[27] D.I. 78 p. 11:15-12:16.
[28] *Id.*; D.I. 81 p. 160:13-15; 167:9-11.
[29] D.I. 78 p. 34:6-10; D.I. 81 p.194:16-195:1; 200:11-21; 244:1-11.
[30] *Id.* p.13:9-19; 136:16-20.
[31] *Id.* p. 27:3-16; D.I. 80 p.247:2-6.
[32] *Id.* p. 53:16-20.
[33] *Id.* p. 47:10-12.
[34] *Id.* p. 47:13-14; 48:15-49:14.

Employees' attendance was tracked by the Homestar managers.[35] Canvassers would report to Homestar at either 9 or 10 a.m.[36] The day would begin with a meeting with the managers.[37] The meeting would last about an hour and would include training and a review of the results from the day before.[38] The canvassers would split up into a few groups, and the groups would go in a van to the neighborhoods where they were canvassing.[39] The members of the van would work as a team once out in the field.[40] Attendance for the day was tracked by the managers on a white board where the groups for each van would be identified, and the pictures of the van group would be taken and submitted to the payroll manager.[41] Homestar had no tracking system for keeping account of the number of hours each canvasser worked.[42] Homestar only kept track of the days worked and not hours worked.[43]

Whittaker kept track of Plaintiff's daily attendance on bi-weekly and master spreadsheets.[44] The spreadsheets are colored-coded to show days worked and how many leads or estimates an employee got in a day.[45] Whittaker testified that the

[35] D.I. 81 p. 80:9-15.
[36] *Id.* p. 48:13-20; 51:8.
[37] *Id.* p. 153:14-20; D.I. 80 61:15-16.
[38] D.I. 78 p. 20:17-21:9; D.I. 80 p. 61:16-17; p. 158:23-159:5.
[39] *Id.* p. 61:17-62:2.
[40] *Id.* p. 81:18-82:1.
[41] *Id.* p.82:11-83:1; 117:15-22; D.I. 78 18:7-17.
[42] D.I. 80 p. 234:15-17; 117:23-120:8; 121:9-15.
[43] D.I. 81 p.234:15-17.
[44] *See* Def. Exs. 2, 4, 7; Ct. Exs. 1-3.
[45] D.I. 81 p. 76:1-4.

color-coding system has changed since Plaintiffs were employed[46], but she remembers the following: red indicated an employee was absent on that day;[47] Saturday and Sundays are a different color to differentiate from the weekdays;[48] and dark and maroon colors corresponded to the level of marketer.[49] Additionally, the bi-weekly spreadsheets have a grid for each week entitled "Days Worked" with a number in it.[50]

Homestar had a system in place to make sure employees could review their pay calculations.[51] Homestar paid employees by direct deposit bi-weekly on a Friday.[52] Pay was issued by a vendor, ADP.[53] The information ADP required to complete the checks was inputted and sent to ADP by Jaffe or Ladden.[54] On the Monday before payday, Whittaker would deliver spreadsheets for each employee outlining the pay calculations for the two-week pay period to Jaffe and Ladden.[55] At the bottom of the spreadsheet, there is a grid providing the total pay for Week 1 and Week 2 considering any bonuses and deductions.[56] After Jaffe and Ladden reviewed the calculations and made any corrections, the employees would get their

---

[46] *Id.* p. 76:18-20; 77:8-11.
[47] *Id.* p. 76:7-8.
[48] *Id.* p. 76:9-11.
[49] *Id.* p. 76:12-14.
[50] *See* Def. Exs. 2, 4, 7.
[51] D.I. 81 p. 71-72:14.
[52] *Id.* p. 92:19-20.
[53] *See* D.I. 80 p. 42:9-11.
[54] D.I. 81 p.233:6-9.
[55] *Id.* p. 71:18-21.
[56] *See* Def. Exs. 2, 4, 7.

spreadsheets.[57] This was done by Tuesday.[58] Employees had until Thursday afternoon to advise Homestar if they had any questions or concerns about the pay calculation for that time period.[59]

Kenney applied for employment with Homestar as a canvasser after seeing an ad on the Indeed job posting site.[60] Kenney had no prior experience as a canvasser.[61] The Indeed job posting was for a marketing position and advised that the job was base plus commission, and the salary range on the Indeed posting was between $40,000 and $93,000.[62] Kenney submitted his job application on or about August 6, 2019.[63] Kenney was interviewed first by phone and then had an in-person interview with Homestar personnel.[64] The job of canvasser (or marketer) was described in detail to Kenney during his interview.[65] During his in-person interview, Kenney learned that the compensation for the job of canvasser was different than what was advertised on Indeed.[66] It was explained to Kenney that the compensation system was base pay or commission – whichever was higher.[67] Kenney understood as a result of what was explained to him by Homestar

---

[57] D.I. 81 p. 71:22-72:8.
[58] *Id.* p. 205:22-206:14.
[59] *Id.* p. 206:15-21.
[60] D.I. 80 p. 30:5-16.
[61] *Id*. p. 119:16-19.
[62] *Id.* p. 30:17-18; 33:14-23; 34:15-18.
[63] *Id.* p. 35:10-20.
[64] *Id.* p. 37:6-12.
[65] D.I. 78 p. 10:22-11:4.
[66] D.I. 80 p. 37:16-23; 97:1-11.
[67] *Id.* p. 56:22-57:7.

personnel during the interview that he could get to the salary range outlined in the Indeed ad but that he would have to work hard and be successful to achieve those numbers.[68] Kenney admitted both during his cross examination and in responses to request for admissions that he never received an offer with a base salary of $40,000.[69]

Kenney accepted the job at Homestar.[70] He worked at Homestar until March 2020.[71] After training, Kenney was advised that he had to purchase clothing from Homestar to wear during canvassing that identified him as a canvasser.[72] Kenney was told that he had to pay for the clothing out of his paycheck and that if he worked for Homestar for six months he would be reimbursed for the amounts he paid for the clothing.[73] Defendant's attendance spreadsheets for Kenney indicate $20 was deducted from each paycheck for his uniforms.[74] He was never reimbursed for the clothing.[75] The clothing was collected from him when he left the company.[76] According to Defendant's spreadsheets kept for him, for the duration of his employment, Defendant charged Kenney $260 for his uniforms.

---

[68] *Id.* p. 39:15-23.
[69] *Id.* p. 92:20-96:3.
[70] *Id.* p. 52:9-15.
[71] *See* Def. Ex. 2.
[72] *Id.* p. 54:17-55:2.
[73] *Id.* p. 56:5-11.
[74] *See* Def. Ex. 2.
[75] *Id.* p. 56:12-14.
[76] *Id.* p. 59:5-12.

Homestar did not require Kenney to clock in and out.[77] As far has he knew, Homestar did not keep track of his hours.[78] Kenney's average workday while at Homestar was 10 hours a day.[79] The canvassers often arrived back to the office after it was dark.[80] This occurred in both the summer and winter months.[81] No overtime was ever paid to him.[82]

Kenney was required to work one Saturday a month.[83] This Saturday could include home shows.[84] Kenney worked three to five home shows while employed at Homestar.[85] Some of these home shows required Kenny (and Galluccio and Sands) to travel to Pennsylvania and New York. The only way a canvasser got paid for a home show or Saturday work was for the leads generated.[86] Hours were not kept, and base pay was not paid for weekend work.[87]

Every paystub Kenney received reflected that he worked 80 hours.[88] The pay stub did not reflect a rate of pay.[89] Kenney believed that he was entitled to

---

[77] D.I. 80 p. 51:9-15; 64:18-21.
[78] *Id.* p. 64:22-23; 65:16-22.
[79] *Id.* p. 63:19-21; 69:9-10.
[80] *Id.* p. 50:14-18.
[81] *Id.* p. 62:11-63:1; 63:19-64:17.
[82] *Id.* p. 65:9-15.
[83] *Id.* p. 40:11-12; 41:4-9.
[84] *See Id.* p. 43:7-10.
[85] *Id.* p. 43:2-5.
[86] *Id.* p. 43:6-44:3.
[87] *Id.* p. 45:21-47:10.
[88] *Id.* p. 72:5-8.
[89] *Id.* p. 72:11-13.

receive at least $769.20 per week based on the Indeed ad that said that the low end of the salary range was $40,000.[90]

Kenney agreed that if he did not show up for work, he would not be paid.[91]

Kenney's weekly wage history revealed the following:[92]

| Week | Days Worked | Gross Pay |
|---|---|---|
| 08/19/2019 | 5 | $520 |
| 08/26/2019 | 4 | $520 |
| 09/02/2019 | 4 | $490 |
| 09/09/2019 | 5 | $500 |
| 09/16/2019 | 4 | $600 |
| 09/23/2019 | 5 | $900 |
| 09/30/2019 | 4 | $510 |
| 10/07/2019 | 4.5 | $362.50 |
| 10/14/2019 | 5 | $545 |
| 10/21/2019 | 5 | $500 |
| 10/28/2019 | 4 | $825 |
| 11/04/2019 | 5 | $405 |
| 11/11/2019 | 5 | $445 |
| 11/18/2019 | 5 | $405 |
| 11/25/2019 | 3 inside sales days | $300 |
| 12/02/2019 | 5 | $405 |
| 12/09/2019 | 3 | $405 |
| 12/16/2019 | 5 | $405 |
| 12/23/2019 | 3 | $255 |
| 12/30/2019 | 3 | $235 |
| 01/06/2020 | 4 | $370 |
| 01/13/2020 | 5 | $455 |
| 01/20/2020 | 4 | $340 |
| 01/27/2020 | 3 | $355 |
| 02/03/2020 | 4 | $650 |
| 02/10/2020 | 4 + 1 inside sales day | $420 |
| 02/17/2020 | 3 | $85 ($170 deduction for no Sat work in February) |

[90] *Id.* p. 79:17-20.
[91] *Id.* p. 68: 6-13; 76:4-8;
[92] *See* Def. Exhibit (Ex.) 2; Ct. Ex. 1.

| 02/24/2020 | 4 | $420 |
| 03/02/2020 | 5 | $660 |

Benjamin Gallucio and Kenney were friends.[93] Kenney referred Gallucio to Homestar.[94] Gallucio had no prior canvassing experience.[95] Like Kenney, Gallucio also saw the Indeed ad.[96] Gallucio interviewed for a canvasser position with Homestar in August 2019.[97] The pay structure was explained to Gallucio in the job interview and during the training.[98] The same explanation was given to Gallucio as was given to Kenney. The paytracker was also reviewed with Gallucio during the interview and training.[99] Like Kenney, Gallucio admitted in a request for admissions that he never received an offer of a base salary as a manner of payment.[100]

Gallucio testified that he was paid in a manner consistent with what was explained to him in the interview.[101] Gallucio, like Kenney, also received the paytracker every Tuesday before payday to review and to make sure that the compensation matched his records as to what he was entitled to receive.[102]

---

[93] D.I. 80 p. 146:14-16.
[94] Id.
[95] Id. p. 184:22-185:3.
[96] Id. p. 146:20-21.
[97] Id. p. 149:18-23.
[98] Id. p. 152:5-8; 188:8-10.
[99] Id. p. 188 11-13; 190:21-191:5-16.
[100] Id. p. 183:3-15.
[101] Id. p. 225:21-226:3.
[102] Id. p. 183:19-184:5.

Also like Kenney, Gallucio was required to purchase apparel to identify himself as a Homestar employee.[103] Deductions were taken from his paycheck.[104] He was never reimbursed for this purchase.[105] The deductions totaled $220.[106] Gallucio's last day of work was in early March 2020.[107]

Gallucio's workday averaged 10-hour days.[108] There were numerous days where the canvassers did not return to the office until after it was dark.[109] Homestar did not track his daily hours.[110]

Gallucio worked every home show that occurred while he was employed at Homestar.[111] Employees were required to work at least one weekend day per month.[112] He was not paid any base pay for Saturdays or home shows.[113]

Gallucio agreed that he needed to show up to work to get paid.[114]

Gallucio's wage history reveals the following:[115]

| Week | Days Worked | Gross Pay |
|------|-------------|-----------|
| 09/23/2019 | 5 | $530 |
| 09/30/2019 | 5 | $500 |
| 10/07/2019 | 5 | $825 |
| 10/14/2019 | 5 | $425 |
| 10/21/2019 | 5 | $500 |

[103] *Id.* p. 177:2-12.
[104] *Id.*
[105] *Id.*
[106] *See* Def. Ex. 4.
[107] D.I. 80 p. 187:3-5.
[108] *Id.* p. 160:11-23; 161:1-8.
[109] *Id.* p. 159:20-160:6.
[110] *Id.* p. 171:19-21.
[111] *Id.* p. 162:19-163:4.
[112] *Id.* p. 164:4-7.
[113] *Id.* p.165:20-166:9.
[114] *Id.* p. 213:8-18.
[115] *See* Def. Ex. 4; Ct. Ex. 3.

| | | |
|---|---|---|
| 10/28/2019 and 11/4/2019 weeks | | $1400 |
| 11/11/2019 | 5 | $425 |
| 11/18/2019 | 3 plus one PTO | $320 |
| 11/25/2019 | 4 | $340 |
| 12/02/2019 | 5 | $405 |
| 12/09/2019 | 3 | $405 |
| 12/16/2019 | 4 | $320 |
| 12/23/2019 | 3 | $255 |
| 12/30/2020 | 4 | $340 |
| 01/06/2020 | 1 | $105 |
| 01/13/2020 | 6 plus PTO | $600 |
| 01/20/2020 | 3 plus PTO | $760 |
| 01/27/2020 | 4 | $380 |
| 02/03/2020 | 4 | $470 |
| 02/10/2020 | 4 | $355 |
| 02/17/2020 | 3 | $255 |
| 02/24/2020 | 5 | $520 |
| 03/02/2020 | 4 | $385 |

Sands had experience as a canvasser prior to applying to Homestar.[116]  At the time of his application to Homestar, Sands was living in Illinois.[117]  He wanted to move to the Delaware area to be closer to his family as his stepfather had been diagnosed with a serious illness.[118]  Sands responded to an Indeed ad with a salary range of $31,200 to $70,000.[119]  Sands drove the 950 miles from his home in Illinois to interview with Homestar.[120]  Sands interviewed with Jaffe and Ladden sometime between January 6, 2020 and January 20, 2020.[121]  The pay structure

---

[116] D.I. 80 p. 233:4-12.
[117] *Id.* p. 231:7-13.
[118] *Id.* p. 229: 20-230:10.
[119] *Id.* p. 231:2-9; 231:21-232:4.
[120] *Id.* p. 231:9-18.
[121] *Id.* p. 232:13-19; 238:12-16.

was explained to him along with the paytracker.[122] Homestar extended an offer of employment to Sands.[123] According to Sands, he asked for, and was provided with, an offer letter.[124] Sands testified that he wanted a letter because he wanted the terms of his employment to be clear.[125] According to Jaffe, Sands asked for an offer letter to provide it to any potential landlord so that he could secure rental housing in Delaware for his family.[126] The letter was addressed "to whom it may concern" and provided in relevant part:

> This is an offer letter for Thomas Sands. Thomas will be starting at Homestar February 3rd, 2020. The position is a base+commission position. The base pay is $31,200. Commission will add up to anywhere between $700-$2,000 every single week. As such Thomas is expected to make anywhere between $40,000-$73,000 over a years [sic] time. If you have any questions please feel free to give me a call at 267-664-0260.[127]

The letter is signed by Daniel Jaffe.[128]

According to Jaffe, the $31,200 figure was arrived at assuming that Sands could secure two to three leads a week which Jaffe thought was very doable given Sands' prior experience.[129] While the reason for this letter is contested by Homestar, a letter was nonetheless provided to Sands.

---

[122] D.I. 78 p.34:6-21; p.38:9-39:1.
[123] D.I. 80 p. 232:20-23; 234:20-235:2.
[124] *Id.* p. 240:5-8; 243:2-8.
[125] *Id.* p. 240:5-19.
[126] D.I. 78 p. 74:11-17.
[127] J-X 8.
[128] *Id.*
[129] D.I. 78 p. 74:17-75:7; 77:3-13.

Sands started with Homestar on February 10, 2020.[130] In reliance on the job offer, Sands relocated his family to Delaware about two months earlier than he was planning on relocating them.[131] Sands asked for Homestar to pay for his hotel room for the three weeks he lived in one until he could move his family to Delaware.[132] Homestar agreed to pay Sands one week at the hotel.[133] Sands went through the training with Homestar and was provided with the paytracker sheet as well.[134] Sands suffered from medical conditions that made it difficult for him to go in the van with the other canvassers.[135] He asked permission to be able to drive to the neighborhoods in his own car and that permission was granted.[136]

Sands worked as an outside canvasser for three weeks until Covid broke out. Once Covid hit, Sands was furloughed for approximately two months.[137] When Homestar called the canvassers back to work Sands discovered after one day that his medical conditions and restrictions prevented him from doing the outside canvassing work.[138] At his request, Homestar moved Sands into an inside sales job where he remained until he voluntarily left the company in September 2020.[139] Sands testified that inside sales was essentially the same as canvassing expect

[130] D.I. 80 p. 239:19-23.
[131] Id. p. 235:21-236:2; D.I. 81 p. 9:17-19.
[132] D.I. 81 p. 11:21-12:5.
[133] D.I. 81 p. 14:5-7.
[134] D.I. 80 p. 248:12-19; 250:18-251:20.
[135] Id. p. 257:20-258:23.
[136] Id. p. 259:1-6.
[137] Id. p. 289:11-16.
[138] Id. p. 288:10-289:4.
[139] Id. p. 288:289:10; D.I. 81 p. 23:23-24:14.

inside sales used cold calling rather than knocking on doors, and inside sales was able to schedule appointments directly.[140] During the three-week period he canvassed, the average work week was ten hours per day.[141] The inside sales job was also a ten-hour per day job.[142] When Sands worked inside sales, he reported to Defendant at the end of the day what time he started and ended.[143] Sands testified that he still worked the same schedule for inside sales as he had canvassing and that each day he worked the same timeframe as the canvassers.[144]

Sands testified that he purchased $950 worth of Homestar clothing.[145] He was told that if he worked six months at Homestar he would be reimbursed for that clothing.[146] He was never reimbursed, and he had to give the uniforms back.[147] Deductions were taken each of Sands's paychecks in the amount of $20.[148]

Sands stopped working at Homestar on September 10, 2020.[149] The following is Sands wage history at Homestar:[150]

| Week | Days worked | Gross Pay |
|------|-------------|-----------|
| 02/10/2020 | 5 | $530 |
| 02/17/2020 | 6 | $700 |
| 02/24/2020 | 3 | $280 |
| 03/02/2020 | 1.5 | $127.50 |

---

[140] D.I. 81 p. 51:2-19; D.I. 78 p.84:17-85:21.
[141] D.I. 80 p. 261:1-5.
[142] D.I. 81 p. 54:4-10.
[143] D.I. 81 p. 25:10-18.
[144] *Id.* p. 53:12-54:10.
[145] *Id.* p. 255:22-256:23.
[146] D.I. 81 p. 255:1-12.
[147] *Id.* p. 256:17257:16.
[148] *Id.* p. 256:5-16.
[149] *Id.* p. 277:16-22.
[150] *See* Def. Ex. 7; Ct. Ex. 2.

| | | |
|---|---|---|
| 03/09/2020 | 2 | $150 |
| 03/16/2020 | 4 | $590 |
| 03/23/2020-5/10/2020 | | Furloughed |
| 05/11/2020 | 3.5 | $567 |
| 05/18/2020 | 5 | $166.96 (deductions for an advance) |
| 05/25/2020 | 5 | $525 |
| 06/01/2020 | 5 | $525 |
| 06/08/2020 | No Data | $525 |
| 06/15/2020 | .5 | $42.5 |
| 06/22/2020 to 07/05/2020 | No Data | $1,125 |
| 07/13/2020 to 07/26/2020 | No Data | $850 |
| 07/27/2020 to 08/09/2020 | No Data | $875 |
| 08/10/2020 to 08/23/2020 | No Data | $510 |
| 08/24/2020 to 09/06/2020 | No Data | $425 |

Each Plaintiff was presented with a copy of the Homestar attendance policy at their orientation, and each Plaintiff signed a copy of the attendance policy.[151]

There are a number of factual issues that I must resolve each of which impacts the Plaintiffs' claims.

First, I am satisfied that as to each Plaintiff the compensation system was explained to them before any of them took the job. It was made clear to each employee before being hired that the base pay was structured on a daily rate that ranged from $425 to $600 per week depending on the number of leads, estimates, and sales that were secured in a given week. It was made clear to each Plaintiff that their compensation was tied to their performance and the minimum daily base pay was $425 per week. It was also clear to the Plaintiffs that in order to be paid

---

[151] D.I. 78 p. 47: 16-18; 48:17; *see* Def. Ex. 3, 4, 6.

they had to show up for work, and, unless they had accrued PTO, they would not be paid for time missed. I am satisfied that before each Plaintiff was hired, they were given a paytracker that showed examples of the pay system and each know that they would be paid every two weeks. In advance of the paycheck being cut, Plaintiffs were given the results of the two week period to show how the pay was calculated for that period and how much they were to receive. This gave Plaintiffs an opportunity to challenge Homestar's calculations.

I find as a fact that all three Plaintiffs were aware of Defendant's compensation system. To the extent it was inconsistent with any Indeed Ad, each Plaintiff knew the compensation system was inconsistent with the Indeed Ad. Each Plaintiff also knew the system was base pay or commission, whichever was greater and that no minimum beyond the $425 per week pay was guaranteed. I reject as a factual matter Plaintiffs' argument that the Defendant engaged in a bait and switch in which Defendant would lure the candidates in with an initial first interview and have a second interview that, according to Plaintiffs, was convoluted gibberish and double speak. I find as a factual matter that there was no bait and switch utilized by the Defendant in this case.

I must resolve the number of hours that the canvassers averaged on a daily basis. Kenney and Gallucio both testified that the average work day was ten hours. Homestar presented testimony through Jaffee and a former employee Janelle

21

Wiser that the workday average was eight hours.[152] Wiser managed both Kenney and Gallucio.[153] She confirmed that the canvassers would meet before each shift for approximately a half an hour and then hit the neighborhoods.[154] According to Wiser, the actual canvassing took about four to five hours, and, during that time, there were breaks, including a lunch break.[155] However, Wiser also testified that it was usually dark when the canvassers returned to Homestar's base.[156] Homestar did not keep track of its employees' daily hours, only the days the employees worked. Based on all of the testimony, I conclude that the more credible testimony is that the employees average workday was 10 hours of work per day when they worked as outside canvassers.

I must address the question of whether any of the Plaintiffs worked weekends and how they were compensated for that work. I find that as to Kenney and Gallucio they were required to work at least one weekend a month. I find that they worked one day on a weekend one day a month for 10 hours each of those days. I find that Kenney, Gallucio and Sands all travelled out of state to attend at least one home show.

---

[152] D.I. 78 p. 127: 21-128:5; D.I. 79 p. 30:12-21.
[153] *Id.* p. 4:20-5:8.
[154] *Id.* p. 49:16-50:2.
[155] *Id.* p. 49: 16-50:2.
[156] *Id.* p. 50:3-4.

I find that Homestar did post the notices required under the various statutes in an area where the plaintiffs could have seen it had they paid attention to it.

I find that Homestar did deliver to Sands the offer letter indicating that he would receive base pay of $31,200 to do the canvassing job. For me it does not matter why the letter was prepared only that it was prepared, given to Mr. Sands and signed by Jaffe.

## ANALYSIS

Plaintiffs have advanced the following claims (1) Fraud/Misrepresentation or the "Bait and Switch" ploy, (2) Violation of the Fair Labor Standards Act, (3) Violation of the Delaware Wage Payment and Collection Act, (4) Breach of Contract, (5) Violation of the Minimum Wage Act of the State of Delaware, (6) Breach of Duty of Good Faith and Fair Dealing, and (7) Unjust Enrichment.

The first matter to address, as it informs the Court's decision on the claims, is the Defendant's statute of limitations defense as it relates to the claims of Kenney and Gallucio.

Suit was filed on February 1, 2021.[157] As to all of plaintiffs state based claims there are two potential applicable statute of limitations, 10 *Del. C.* § 8106 which is Delaware's three-year statute for breach of contract claims, and 10 *Del. C.* § 8111, which deals with claims "for recovery upon a claim for wages, salary,

---

[157] D.I. 1.

23

or overtime work, labor or personal services performed and provides for a one-year statute of limitations.[158]  If the claims arise from services which have been performed, then the one-year period applies.  In contrast, where a plaintiff's claims arise upon or after the termination of the employer-employee relationship, then the three-year statute applies.[159]  Plaintiffs' claims very clearly arise from services which have been performed.  Therefore, the one-year statute applies.

Plaintiffs first contend that the statute has tolled because the Defendant failed to comply with the disclosure requirements of the Delaware Wage and Collection Act,[160] which requires an employer to post in the workplace a poster notifying employees of certain rights.[161]  Given that I have found as a factual matter that the Defendant did in fact post the required notice, this tolling argument has no merit.

Plaintiffs next contend that the Defendant waived the statute of limitations defense by not including it in their answer.  Defendant contends not so.  The instant matter is a consolidated action.[162]  Originally, a separate lawsuit was filed by each Plaintiff, and, in the answer to each of those lawsuits, Defendant asserted the

---

[158] 10 *Del. C.* § 8111 was amended by 84 Del. Laws c.20, § 1, effective April 26, 2023, to extend the limitations period under this section to two years.  However, as this case was filed before the amendment was effect, it has no applicability to this case.

[159] *Little Switzerland Inc. v. Hopper*, 867 A.2d 955 (Del. Ch. 2005); *Compass v. American Mirrex Corp.*, 72 F.Supp.2d 462 (D. Del. 1999).

[160] 19 *Del. C.* § 1108(3).

[161] *Turner et. al. v. Diamond Shamrock Chemicals Co.*, 1987 WL 17175 (Del. Super. Sept. 14, 1987).

[162] *See* D.I. 9.

statute of limitations as an affirmative defense.[163]   After the cases were consolidated and the Plaintiffs' depositions were taken, Plaintiffs moved to file an amended complaint – which the Court granted.[164]  The Amended Complaint was filed.[165]  In the Answer to the Amended Complaint, the statute of limitations was not raised as a defense.[166]  In the pretrial stipulation, Defendant asserted the statute of limitations again.[167]

Delaware law provides the Court with the discretion to permit a defendant to amend its answer to assert previously unasserted defenses.[168]  Moreover, the Court has the discretion to allow the amendment of an answer so long as the amendment does not unduly surprise or prejudice the plaintiff.[169]  The Court should give leave to amend an answer "freely" when justice so requires, and, although leave to amend is not automatic, "Delaware courts generally grant motions to amend liberally."[170]

At the time of Plaintiffs' depositions, the operative Complaint and Answer had the statute of limitations in play for both Gallucio and Kenney.  Other than

---

[163] *See Thomas M. Sands v. Homestar Remodeling LLC*, N21C-02-008, D.I. 5 p.9; *Benjamin J. Gallucio v. Homestar Remodeling LLC*, N21C-02-010, D.I. 5 p.8; *Logan E. Kenney v. Homestar Remodeling LLC*, N21C-02-012, D.I. 4 p. 8.
[164] D.I. 29.
[165] D.I. 137.
[166] *See* D.I. 38.
[167] D.I. 63.
[168] *Festival Fun Parks, LLC v. MS Leisure Co.*, 2023 WL 8714994, at *7 (Del Super. Dec. 18, 2023) (citing *Knutkowski v. Cross*, 2011 WL 6820335, at *2 (Del. Ch. Dec. 22, 2011)).
[169] *Id.*
[170] *Id.* (quoting *MVC Cap. Inc. v. U.S. Gas & Elec., Inc.*, 2021 WL 4486462, at *2 (Del. Super. Oct. 1, 2021)).

asserting additional causes of action, the Amended Complaint did not change the Plaintiffs' claims. Given the procedural posture of this case and the fact that I allowed the Plaintiffs to amend their Complaint, I will grant the Defendants request to assert the statute of limitations defense.

Applying the one-year limitations period under 10 *Del. C.* § 8111, Gallucio and Kenney's state-based claims before February 1, 2020 are barred as well as their claim to recover the money deducted from their paychecks for uniforms.

The Fair Labor Standards Act has a two-year statute of limitations. 29 U.S.C.A. 255. As outlined below I find that defendant violated the Fair Labor Standards Act. As all of the plaintiffs' claims based on the Fair Labor Standards Act fall within the two-year period none of the Fair Labor Standard Act claims are barred by the statute of limitations.

## **VIOLATION OF THE FAIR LABOR STANDARDS ACT ("FLSA")**

Section 207 of the FLSA requires employers to compensate their employees for working more than forty hours in one work week.[171] When that is the case, employers must pay the employees "at a rate not less than one and one-half times the regular rate at which he is employed."[172] An employer who violates this Section is liable for the employee's unpaid overtime compensation as well as

---

[171] 29 U.S.C. § 207(a)(1).
[172] *Id.*

additional liquidated damages.[173] Liquidated damages are mandatory, and the court only has discretion to deny them if an employer can demonstrate by plain and substantial proof that it "acted in good faith and that [it] had reasonable grounds" to believe it did not violate the FLSA.[174] The purpose of the liquidated damages provision is to acknowledge that "double payment must be made to compensate employees for losses they might suffer by not receiving their lawful payment when it was due."[175]

Defendants correctly point out that for the FLSA to apply the employment must involve interstate commerce. I find as a factual matter that plaintiffs have satisfied the interstate commerce requirement of the statute by the fact that they each travelled to a home show for work that was out of state.

I have found as a factual matter Plaintiffs accrued 50 hours of work when they worked five days in one week. In accordance with FLSA requirements, Plaintiffs must be paid time and a half for the extra ten hours worked those weeks. I have also found as a factual matter that each Plaintiff was required to work at least one weekend day a month. When Plaintiffs worked 40, or more, hours during the

---

[173] *Id.* § 216(b).

[174] 29 U.S.C. § 260; *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *12 (Del. Ch. June 2, 2006) (quoting *Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 187 (3d. Cir. 1988)); *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d. Cir. 1984).

[175] *Brooks v. Vill. Of Ridgefield Park*, 185 F.3d 130, 137 (3d. Cir. 1999).

week, Plaintiff is also owed overtime compensation for any weekend hours worked.

Additionally, Defendant did not comply with the FLSA's requirement to keep and preserve record of Plaintiffs' hours worked.[176]

Plaintiffs complain that the Defendant failed to withhold State and Federal taxes from their paychecks, as required by law. While Plaintiffs are correct that Defendant was obligated to withhold taxes from Plaintiffs' wages, Plaintiffs have previously conceded that this failure does not provide Plaintiffs, as opposed to the taxing authorities, with any remedy.[177] Plaintiffs have also previously conceded that the law does not recognize a private right of action to an employee against an employer for the employer's failure to withhold federal and/or state income taxes.[178] The Court agrees that there is no private right of action for this claim. Therefore, judgment is entered in favor of the Defendant on Plaintiffs' claim for failure to withhold taxes.[179]

## VIOLATION OF THE DELAWARE MINIMUM WAGE ACT

Under Delaware's Minimum Wage Act, "every employer shall pay to every employee in any occupation wages of a rate" not less than the amount established

---

[176] 29 U.S.C. § 211(c).

[177] D.I. 36 p. 3-4.

[178] *Id.* (citing 26 U.S.C. §3403; *Burda v. M. Ecker Co.*, 2 F.3d 769, 775 (7th Cir. 1993); *Edgar v. Inland Steel Co.*, 774 F.2d 1276, 1278 (7th Cir. 1984); *Parker v. Amazon.com.indc LLC*, 2018 WL 5306874 (S.D. Ind. 2018); *Rumfelt v. Jazzie Pools, Inc.*, 2011 WL 2144553 (E.D. Va. 2011)).

[179] Plaintiffs request that this Court refer this matter to the relevant taxing authorities to advise of the Defendant's violations. The Court declines to accept Plaintiffs' invitation to take this step.

in the statute.[180]  An employer who fails to pay its employees minimum wage is liable to its employees for the full amount of wages entitled by minimum wage requirements minus any amount actually paid.[181]  In September 2019, when Kenney and Gallucio began working for Homestar, Delaware's minimum wage requirement was $8.75.[182]  The statute was amended to increase the minimum wage to $9.25 as of October 1, 2019.[183]

The Minimum Wage Act also requires employers to keep and preserve a record of employees' hours worked each day.[184]  As stated above, Defendant failed to properly record and preserve Plaintiffs' hours worked each day.

## BREACH OF CONTRACT

A valid, enforceable contract requires an offer, acceptance, consideration, and parties' intent that the contract is binding.[185]  A contract must also "contain all material terms in order to be enforceable," and the terms must be sufficiently definite.[186]  It is well-established that a valid offer is the "manifestation of

---

[180] 19 *Del. C.* § 902(a).
[181] *Id.* § 911.
[182] *Id.*, amended by 81 Del. Laws, c. 301, §1; *see* § 902(a)(3) of the amendment.
[183] *Id.*, amended by 81 Del. Laws, c. 301, §1; *see* § 902(a)(4) of the amendment.  Delaware's minimum wage statute has since been amended to reflect another increase in minimum wage; however, the amendment was not effective until after Plaintiffs ceased working for Homestar.  *Id.*, amended by 83 Del. Laws, c. 81, § 1.
[184] 19 *Del. C.* § 907.
[185] *Shilling v. Shilling*, 332 A.3d 453, 462 (Del. 2024).
[186] *Id.* (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."[187] A job posting is not itself an offer; it is an invitation to negotiate the terms of potential employment.[188]

As to Kenney and Gallucio, a contract based on the Indeed ad was not formed with Homestar. The Indeed ad was not an offer.[189] Instead, they were invitations for Kenney and Gallucio to discuss with Homestar the terms of potential employment – which is exactly what the parties did.[190] Jaffe and Ladden discussed Homestar's compensation plan with Kenney and Gallucio during their in-person interviews and training.[191] That is the salary Kenney and Gallucio understood and agreed to work for, not the salary listed in the Indeed ad.

In contrast, Homestar's offer letter to Sands was more than an invitation to negotiate. The letter, dated February 3, 2020, stated "[t]his is an offer letter for Thomas Sands" and stated Sands' base pay for the year.[192] The letter is signed by Homestar's owner, Daniel Jaffe, and includes a scan of Sands' driver's license.[193]

---

[187] *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 156 (Del. Ch. 1985) (citing Restatement (Second) of Contracts § 24 p.71 (1981)).
[188] *Keene Corp. v. Hoofe*, 267 A.2d 618, 622-23 (Del. Ch. 1970) (holding the terms of a job posting were not binding terms on the parties, but rather the court looked to what the parties formally agreed upon in later discussions); *see Salisbury v. Credit Service*, 199 A. 674, 681 (Del. Super. Ct. 1937) ("[A] mere statement of a person's willingness to enter into negotiations with another person is in no sense an offer and cannot be accepted so as to form a binding contract.")
[189] *See* Joint Trial Exhibit ("J-X") 1-5.
[190] *See* D.I. 80 p. 37:16-23; 56:22-57:7; 97:1-11; 149:18-23; 188:8-10.
[191] *See Id.* 97:1-11; 188:8-10; D.I. 78 p. 10:11-14:10.
[192] *See* J-X 8.
[193] *Id.*

Additionally, it does not matter whether Jaffe subjectively intended to enter into a contract with Sands. "Overt manifestation of assent," not subjective intent, informs whether a contract has been formed with the parties' requisite intent.[194]

Homestar must pay Sands on the terms of the contract – an amount based on at a $31,200 yearly base pay.[195] The contract clearly entitles Sands to the contract amount.

## VIOLATION OF THE DELAWARE WAGE PAYMENT AND COLLECTION STANDARDS ACT ("DWPCA")

The Delaware Wage Payment and Collection Standards Act requires employers to pay all wages due to their employees on the designated paydays and refrain from withholding wages.[196] This Act also requires an employer to keep record of the hours each employee works.[197] If the Court enters a judgment for a plaintiff under

---

[194] *See Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) (quoting *Black Horse Cap., LP v. Xstelos Holdings, Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) (quoting *Indus. Am., Inc v. Fulton Indus., Inc.,* 285 A.2d 412, 415 (Del. 1971)) (citing 2 *Williston on Contracts* note142, at § 6:3 (4th ed.) ("[S]ince the formation of informal contracts depends not upon an actual subjective meeting of the minds, but instead upon outward, objective manifestations of assent, an actual intention to accept is unimportant except in those situations when the acts or words of the offeree are ambiguous.")

[195] The letter states the following, "[t]he base pay is $31,200. Commission will add up to anywhere between $700-$2000 every single week. As such Thomas is expected to make anywhere between $40,000-$73,000 over a year's time.

[196] 19 *Del. C.* § 1102; 1107.

[197] *Id.* § 1108(6).

31

this Act, the plaintiff can be awarded costs and reasonable attorney's fees paid by the defendant.[198]

Under the DWPCA Section 1103(b), an employer who "without reasonable grounds for dispute under…§ 1107 of this title, fails to pay an employee wages as required under this chapter," is liable to its employees for liquidated damages in the lesser amount of: (a) ten percent of the unpaid wages for each day, except Sunday and legal holidays, upon which the failure continues after the day upon which payment is required, or (b) an amount equal to the unpaid wages.[199] This Court has held that it aligns with public policy to apply the provisions of Title 19, Chapter 11 of the Delaware Code to an employee entitled to pay no matter the source of that employee's right to wages – whether that source is by contract or statute.[200]

Based on the calculation of damages contained later in this Opinion, I find that Defendant violated DWPCA Section 1102 for failing to pay wages due to Plaintiffs and Section 1107 for withholding Plaintiffs' wages. To recover under Section 1103(b), an absence of reasonable grounds for dispute must be proven.[201] The

---

[198] *Id.* § 1113(c).

[199] *Id.* § 1103(b)(2)a-b. The purpose for recovery of liquidated damages is to "provide [] for a penalty in an amount equal to the amount of the outstanding wages if the employer has withheld pay from an employee without reasonable grounds." *Kutney v. Saggese*, 2002 WL 1463092, at *1 (Del. Super. July 8, 2002).

[200] *State ex rel. Christopher v. Planet Ins. Co.*, 321 A.2d 128, 133 (Del. Super. May 24, 1974) (holding that plaintiffs could recover under Chapter 11's provisions, including Section 1103(b), because wages provided for in a contract fall under Chapter 11's definition of wages).

[201] *See* 19 *Del. C.* § 1103(b).

Code does not define "reasonable grounds for dispute," but case law provides some guidance.[202] Defendant fails to demonstrate a reasonable ground for dispute for withholding Plaintiffs' wages and, thus, owes liquidated damages to all Plaintiffs.

I have also found, based on testimony and Defendant's lack of documentation, that Defendant did not keep record of the Plaintiffs' hours worked. Therefore, Defendant violated DWPCA Section 1108(6).

## **FRAUD AND MISREPRESENTATION**

The elements of fraud and misrepresentation are the following:

> (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[203]

A false representation is an "overt misrepresentation" or a "deliberate concealment of material facts, or [] silence in the face of a duty to speak."[204]

---

[202] *Delaware Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 654 (Del. 2006) (holding a reasonable ground for dispute is "when an employee leaves owing an employment-related debt to his employer, the employer may deduct the employee's debt from final wages.")

[203] *E.I. DuPont de Nemours and Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461-62 (Del. 1999). Under Delaware law, the elements for common law fraud, fraudulent inducement, and fraudulent misrepresentation are the same. *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *31 (Del. Ch. Dec. 3, 2018); *Oglesby v. Conover*, 2011 WL 3568276, at *3 (Del. Super. May 16, 2011).

[204] *Id.* at *32 (quoting *Stephenson v. Capano Dev.*, 462 A.2d 1069, 1074 (Del. 1983).

Plaintiffs assert that Defendant's made false representations intending to induce the Plaintiffs to work for Defendant through fraudulent job descriptions and compensations on the Indeed advertisement.[205] Despite what the advertisements stated, I have already determined, as a factual matter, that each Plaintiff knew what Defendant's compensation plan was upon taking the position. The compensation plan discussed by Homestar employees with Plaintiffs may have differed from the salaries listed in the advertisements. Nonetheless, after discussing the compensation plan with Jaffe and Ladden, Plaintiffs understood how Defendant was compensating them for their work, and Defendant employed the compensation plan discussed.

There is no evidence that Defendant intentionally or negligently made false representations to induce Plaintiffs to work for them. Moreover, given my finding that the pay structure was adequately explained to Plaintiffs before they began work, there was no justifiable reliance on the part of Plaintiffs to the Indeed ad. Therefore, Defendant is not liable for fraud or misrepresentation.

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

The duty of good faith and fair dealing applies to every contract.[206] The duty is "'best understood as a way of implying terms in the agreement,' whether

---

[205] D.I. 86 p. 22, 45.

[206] *Loeffler v. MNTN, Inc.*, 2025 WL 1256148, at *5 (Del. Super. Apr. 28, 2025) (citing *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 101 (Del. 1992); *Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581, 597 (Del. 1948)).

employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[207] It "does not establish a free-floating requirement that a party act in some morally commendable sense," nor "does it 'require that a party have acted in subjective good faith.'"[208] The implied duty "ensures that the parties deal honestly and fairly with each other when addressing gaps in their agreement."

The implied duty has been narrowly applied in employment contract circumstances.[209] In *Merrill v. Crothall-American Inc.*, the Delaware Supreme Court adopted the rule that for an employer to have breached the implied covenant "the conduct of the employer must constitute 'an aspect of fraud, deceit or misrepresentation.'"[210] The Court later emphasized this duty applies to an employer conduct which "manifest[s] bad faith or unfair dealing achieved by deceit or misrepresentation in falsifying or manipulating a record to create fictious grounds to terminate employment."[211]

There was no contract between Homestar and Kenney and Gallucio, therefore this claim is inapplicable to them. As to Sands, he has failed to show the Court an unanticipated development or gap in his contract with Homestar which warrants

---

[207] *Loeffler*, 2025 WL 1256148, at *5 (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).
[208] *Loeffler*, 2025 WL 1256148, at *5 (quoting *Allen v. EL Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 182-83 (Del. Ch. 2014)).
[209] *See E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 443-44 (Del. 1996); *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 102 (Del. 1992).
[210] 606 A.2d at 101 (quoting *Magnan v. Anaconda Indus., Inc.*, 429 A.2d 492, 494 (Conn. Super. Ct. 1980)).
[211] *Pressman*, 679 A.2d at 443-444.

the Court to find that there was a specific implied contractual obligation Homestar owed to Sands. The money Homestar owes to Sands for his employment is an express term in their contract which is appropriate for a breach of contract claim – not a breach of implied duty of good faith and fair dealing claim.[212] Even if the Court were to find an implied covenant within the contract, I have already established that Homestar did not act with fraud or deceit in hiring and employing Sands.

## **UNJUST ENRICHMENT**

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[213] A successful claim for unjust enrichment requires "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, and (4) the absence of justification."[214]

Plaintiffs claim Defendant was unjustly enriched by withholding money owed to Plaintiffs and failing to take out taxes from Plaintiffs' paychecks.[215] Further,

---

[212] *See* J-X 8; *see Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 458 (Del. Ch. 2023) ("[A] court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply…")

[213] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[214] *Id.* The Delaware Supreme Court held the traditional fifth element, "the absence of a remedy provided by law," is only required when an unjust enrichment claim is brought in Court of Chancery. *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 391 (Del. 2023).

[215] D.I. 86 p.72.

Plaintiffs contend Defendant was unjustly enriched by its failure to reimburse Plaintiffs for the $20 taken from each paycheck for uniforms.[216]

Discussed *supra*, Plaintiffs do not have a claim to recover for Defendant's failure to withhold State and Federal taxes. Additionally, the Court is allowing Plaintiffs to recover the wages owed to them, subject to applicable statute of limitations periods, under the recited statutory provisions. As to reimbursement for uniforms, Kenney and Gallucio are barred by the statute of limitations from recovering for their uniforms. However, Sands may recover for the $950 he testified that he had to pay for the uniforms Defendant took back and failed to reimburse for.

## CALCULATION OF DAMAGES

First, I turn to calculation of Kenney and Gallucio's damages under the FLSA and Delaware's Minimum Wage Act. The calculations are based on Delaware's $9.25 minimum wage and a correlating time and a half overtime compensation of $13.88. [217] As stated above, I have found as a factual matter that each day is a 10-hour day. I gathered the hours and pay data from Defendant's attendance tracking spreadsheets and the ADP Earning Statements – both entered into evidence – trial

---

[216] *Id.* p.75.

[217] In Delaware, to meet minimum wage, an employee working 40 hours in a week must be paid $370.00 for the week (40 hours x $9.25), an employee working 30 hours in a week must be paid $277.50 (30 hours x $9.25), an employee working 20 hours in a week must be paid $185.00 for the week (20 hours x $9.25), and so on. The $9.25 rate went into effect on October 1, 2019. Prior to October 1, 2019, the rate was $8.25. The appropriate rate has been used for the relevant time period.

testimony on hours worked, and the fact that Defendant did not keep hourly records.[218]

The below charts are my calculations of how much Defendant owes Kenney and Gallucio, respectively, in unpaid wages under the FLSA and Delaware's Minimum Wage Statute. Since the Court finds Sands has a contract with a different amount his calculations were done separately.

**Logan Kenney[219]**

| Week | Days Worked | Normal Hours Worked | Overtime Hours Worked | Calculation | Amount Paid | Amount Owed |
|---|---|---|---|---|---|---|
| 08/19/2019 | 5 days | 40 hours | 10 hours | (40 hours) x ($8.75) = $350 | $520.00 | $0 |
| | | | | (10 hours) x ($12.75) = $127.50 | | |
| 08/26/2019 | 4 days | 40 hours | 0 hours | (40 hours) x ($8.75) = $350 | $520.00 | $0 |
| 09/02/2019 | 4 days | 40 hours | 0 hours | (40 hours) x ($8.75) = $350 | $490.00 | $0 |
| 09/09/2019 Not paid overtime | 6 days[220] (included monthly weekend day) | 40 hours | 20 hours | (40 hours) x ($8.75) = $350 | $500.00 | $605.00 - $500.00 = $105.00 |
| | | | | (20 hours) x ($12.75) = $255.00 | | |

---

[218] *See* Def. Exs. 2, 4, 7; Ct. Exs. 1-3.

[219] In some circumstances, the ADP Earning Statement and corresponding spreadsheet do not match the total number paid to a Plaintiff for that two-week period. In those instances, I used whichever number was lower. This applies to all calculations for each Plaintiff.

[220] Because I have found as a factual matter that Plaintiffs worked one weekend day a month, I have added ten hours to the week with the highest number of hours already worked.

| Date | Days | Regular Hours | Overtime Hours | Calculation | | |
|---|---|---|---|---|---|---|
| 09/16/2019 | 4 days | 40 hours | | (40 hours) x ($8.75) = $350 | $600.00 | $0 |
| 09/23/2019 | 5 days | 40 hours | 20 hours | (40 hours) x ($8.75) = $350 | $900.00 | $0 |
| | | | | (20 hours) x ($12.75) = $255.00 | | |
| 09/30/2019 | 4 days | 40 hours | | (40 hours) x ($8.75) = $350 | $510.00 | $0 |
| 10/07/2019 Not paid overtime | 4.5 days | 40 hours | 5 hours | (40 hours) x ($9.25) = $370 | $362.50 | $439.40 - $362.50 = $76.90 |
| | | | | (5 hours) x ($13.88) = $69.40 | | |
| 10/14/2019 | 5 days | 40 hours | 10 hours | (40 hours) x ($9.25) = $370 | $545.00 | $0 |
| | | | | (10 hours) x ($13.88) = $138.80 | | |
| 10/21/2019 Not paid overtime | 6 days (included monthly weekend day) | 40 hours | 20 hours | (40 hours) x ($9.25) = $370 | $500.00 | $647.60 - $500.00 = $147.60 |
| | | | | (20 hours) x ($13.88) = $277.60 | | |
| 10/28/2019 | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $825.00 | $0 |
| 11/04/2019 Not paid overtime | 5 days | 40 hours | 10 hours | (40 hours) x ($9.25) = $370 | $405.00 | $508.80 - $405.00 = $103.80 |
| | | | | (10 hours) x ($13.88) = $138.80 | | |
| 11/11/2019 Not paid overtime | 5 days | 40 hours | 10 hours | (40 hours) x ($9.25) = $370 | $445.00 | $508.80 - $455.00 = $63.80 |

| | | | | (10 hours) x ($13.88) = $138.80 | | |
|---|---|---|---|---|---|---|
| 11/18/2019 Not paid overtime | 6 days (included monthly weekend day) | 40 hours | 20 hours | (40 hours) x ($9.25) = $370 | $405.00 | $647.60 - $405.00 = $242.60 |
| | | | | (20 hours) x ($13.88) = $277.60 | | |
| 11/25/2019 | 3 days | 30 hours | 0 hours | (30 hours) x ($9.25) = $277.50 | $300.00 | $0 |
| 12/02/2019 Not paid overtime | 5 days | 40 hours | 10 hours | (40 hours) x ($9.25) = $370 | $405.00 | $508.80 - $405.00 = $103.80 |
| | | | | (10 hours) x ($13.88) = $138.80 | | |
| 12/09/2019 | 3 days | 30 hours | 0 hours | (30 hours) x ($9.25) = $277.50 | $405.00 | $0 |
| 12/16/2019 Not paid overtime | 6 days (included monthly weekend day) | 40 hours | 20 hours | (40 hours) x ($9.25) = $370 | $405.00 | $647.60 - $405.00 = $242.60 |
| | | | | (20 hours) x ($13.88) = $277.60 | | |
| 12/23/2019 Not paid minimum wage | 3 days | 30 hours | 0 hours | (30 hours) x ($9.25) = $277.50 | $255.00 | $277.50 - $255.00 = $22.50 |
| 12/30/2019 Not paid minimum wage | 3 days | 30 hours | 0 hours | (30 hours) x ($9.25) = $277.50 | $235.00 | $277.50 - $235.00 = $42.50 |
| 01/06/2020 | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $370.00 | $0 |
| 01/13/2020 Not paid overtime | 6 days (included monthly | 40 hours | 20 hours | (40 hours) x ($9.25) = $370 | $455.00 | $647.60 - $455.00 = $192.60 |

| | weekend day) | | | | | |
|---|---|---|---|---|---|---|
| | | | | (20 hours) x ($13.88) = $277.60 | | |
| 01/20/2020 Not paid minimum wage | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $340.00 | $370.00 - $340.00 = $30.00 |
| 01/27/2020 | 3 days | 30 hours | 0 hours | (30 hours) x ($9.25) = $277.50 | $355.00 | $0 |
| 02/03/2020 | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $650.00 | $0 |
| 02/10/2020 Not paid overtime | 5 days | 40 hours | 10 hours | (40 hours) x ($9.25) = $370 | $420.00 | $508.80 - $420.00 = $88.80 |
| | | | | (10 hours) x ($13.88) = $138.80 | | |
| 02/17/2020 Not paid minimum wage | 3 days | 30 hours | 0 hours | (30 hours) x $9.25 = $277.50 | $85.00 | $277.50 - $85.00 = $192.50 |
| 02/24/2020 | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $420.00 | $0 |
| 03/02/2020 | 6 days (included monthly weekend day) | 40 hours | 20 hours | (40 hours) x ($9.25) = $370 | $660.00 | $0 |
| | | | | (20 hours) x ($13.88) = $277.60 | | |

Overtime compensation owed: $1,367.50
Minimum wage owed: $192.50[221]
**TOTAL OWED:** $1560.00

---

[221] The claims for minimum wage owed before February 3rd, 2020, are barred by the Statute of Limitations, as discussed in this opinion. Therefore, the minimum wage deficiencies on the following dates are not included in the final calculation: 12/23/2019, 12/30/2019, and 01/20/2020.

## Benjamin Gallucio

| Week | Days Worked | Normal Hours Worked | Overtime Hours Worked | Calculation | Amount Paid | Amount Owed |
|---|---|---|---|---|---|---|
| 09/23/2019 | 5 days | 40 hours | 10 hours | (40 hours) x ($8.75) = $350 | $530.00 | $0 |
| | | | | (10 hours) x ($13.88) = $138.80 | | |
| 09/30/2019 Not paid overtime | 5 days | 40 hours | 10 hours | (40 hours) x ($8.75) = $350 | $500.00 | $0 |
| | | | | (10 hours) x ($13.88) = $138.80 | | |
| 10/07/2019 | 5 days | 40 hours | 10 hours | (40 hours) x ($9.25) = $370 | $825.00 | $0 |
| | | | | (10 hours) x ($13.88) = $138.80 | | |
| 10/14/2019 Not paid overtime | 6 days (included monthly weekend day) | 40 hours | 20 hours | (40 hours) x ($9.25) = $370 | $425.00 | $647.60 - $425.00 = $222.60 |
| | | | | (20 hours) x ($13.88) = $277.60 | | |
| 10/21/2019 | 5 days | 40 hours | 10 hours | (40 hours) x ($9.25) = $370 | $500.00 | $0 |
| | | | | (10 hours) x ($13.88) = $138.80 | | |
| 10/28/2019 [222] | | | | | | |
| 11/04/2019 | | | | | | |
| 11/11/2019 | | | | | | |

---

[222] The Court was not provided with any information for these weeks other than the gross pay for this period was $1400. Plaintiff has not sustained his burden of proof for this period.

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/18/2019 Not paid minimum wage | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $320.00 | $370.00 - $320.00 = $50.00 |
| 11/25/2019 Not paid minimum wage | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $340.00 | $370.00 - $340.00 = $30.00 |
| 12/02/2019 Not paid overtime | 6 days (included monthly weekend day) | 40 hours | 20 hours | (40 hours) x ($9.25) = $370 | $405.00 | $647.60 - $405.00 = $242.60 |
| | | | | (20 hours) x ($13.88) = $277.60 | | |
| 12/09/2019 | 3 days | 30 hours | 0 hours | (30 hours) x ($9.25) = $277.50 | $405.00 | $0 |
| 12/16/2019 Not paid minimum wage | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $320.00 | $370.00 - $320.00 = $50.00 |
| 12/23/2019 Not paid minimum wage | 3 days | 30 hours | 0 hours | (30 hours) x ($9.25) = $277.50 | $255.00 | $277.50 - $255.00 = $22.50 |
| 01/02/2020 | 1 day | 10 hours | 0 hours | (10 hours) x ($9.25) = $92.50 | $105.00 | $0 |
| 01/13/2020 Not paid overtime | 7 days (included monthly weekend day) | 40 hours | 30 hours | (40 hours) x ($9.25) = $370 | $600.00 | $786.40 - $600.00 = $186.40 |
| | | | | (30 hours) x ($13.88) = $416.40 | | |
| 01/20/2020 | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $700.00 | $0 |
| 01/27/2020 | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $380.00 | $0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/03/2020 | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $470.00 | $0 |
| 02/10/2020 Not paid minimum wage | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $355.00 | $370.00-$355.00 = $15.00 |
| 02/17/2020 Not paid minimum wage | 3 days | 30 hours | 0 hours | (30 hours) x ($9.25) = $277.50 | $255.00 | $277.50 - $255.00 = $22.50 |
| 02/24/2020 Not paid overtime | 6 days (included monthly weekend day) | 40 hours | 20 hours | (40 hours) x ($9.25) = $370 | $520.00 | $647.60 - $520.00 = $127.60 |
| | | | | (20 hours) x ($13.88) = $277.60 | | |
| 03/02/2020 | 4 days | 40 hours | 0 hours | (40 hours) x ($9.25) = $370 | $385.00 | $0 |

Overtime compensation owed: $779.20
Minimum wage owed: $37.50[223]
**TOTAL OWED:** $816.70

From the above analyses, I find that Defendant violated the FLSA and Delaware's Minimum Wage Act by failing to pay Kenney and Gallucio Delaware's minimum wage and the FLSA's required overtime compensation. Under the Delaware Minimum Wage Act, Defendant owes Kenney and Gallucio the full amount of wages entitled by minimum wage requirements minus any amount actually paid. Therefore, for violating Section 902 of Delaware's Minimum Wage Act, Defendant owes Kenney $192.50 and owes Gallucio $37.50.

---

[223] The claims for minimum wage owed before February 3rd, 2020, are barred by the Statute of Limitations, as discussed in this opinion. Therefore, the minimum wage deficiencies on the following dates are not included in the final calculation: 11/18/2019, 11/25/2019, 12/16/2019, and 12/23/2019.

Under the FLSA, Defendant owes Kenney and Gallcuio their unpaid overtime compensation. For this violation Section 207 of the FLSA, Defendant owes Kenney $1367.50 and owes Gallucio $779.20.

Turning to Sands, the below chart is my calculation of how much in unpaid wages Defendant owes Sands under the parties' contract. Per the contract, my calculation is based on the contract's promised base pay of $31,200 which correlates to a $15/hour rate of pay and an overtime compensation of $22.50. Each day is a 10-hour day, and I gathered the hours and pay data from Defendant's attendance tracking spreadsheets and the ADP Earning Statements – both entered into evidence – trial testimony on hours worked, and the fact that Defendant did not keep hourly records.[224]

**Thomas Sands**

| Week | Days Worked | Normal Hours Worked | Overtime Hours Worked | Calculation | Amount Paid | Base Pay Owed | Overtime Comp Owed |
|---|---|---|---|---|---|---|---|
| 02/10/2020 not paid overtime | 5 days | 40 hours | 10 hours | (40 hours) x ($15.00) = $600 | $530.00 | $600.00 - $530.00 = $70.00 | $225 |
| | | | | (10 hours) x ($22.50) = $225 | | | |
| 02/17/2020 not paid overtime | 7 days[225] (included monthly weekend day) | 40 hours | 30 hours | (40 hours) x ($15.00) = $600 | $700.00 | $0 | $675.00 – ($700.00 - $600.00) = $575.00 |

---

[224] *See* Def. Exs. 2, 4, 7; Ct. Exs. 1-3.

[225] Because I have found as a factual matter that Plaintiffs worked one weekend day a month, I have added ten hours to the week with the highest number of hours already worked.

| Date | Days | Hours | Overtime | Calculation | | | |
|---|---|---|---|---|---|---|---|
| | | | | (30 hours) x ($22.50) = $675 | | | |
| 02/24/2020 | 3 days | 30 hours | 0 hours | (30 hours) x ($15.00) = $450 | $280.00 | $450.00-$280.00 = $170.00 | $0 |
| 03/02/2020 | 1.5 days | 15 hours | 0 hours | (15 hours) x ($15.00) = $225.00 | $127.50 | $225.00-$127.50= $97.50 | $0 |
| 03/09/2020 | 2 days | 20 hours | 0 hours | (20 hours) x ($15.00) = $300 | $150.00 | $300.00-$150.00 = $150.00 | $0 |
| 03/16/2020 | 4 days | 40 hours | 0 hours | (40 hours) x ($15.00) = $600 | $590 | $600.00-$590.00 = $10.00 | $0 |
| **COVID** | | | | | | | |
| 05/11/2020 | 3.5 days | 40 hours | 0 hours | (40 hours) x ($15.00) = $600 | $367.50 | $600.00-$367.50 = $232.50 | $0 |
| 05/18/2020 not paid overtime | 5 days | 40 hours | 10 hours | (40 hours) x ($15.00) = $600 | $525.00 | $600.00 - $525.00 = $75.00 | $225 |
| | | | | (10 hours) x ($22.50) = $225 | | | |
| 05/25/2020 not paid contractual rate or overtime | 5 days | 40 hours | 10 hours | (40 hours) x ($15.00) = $600 | $525.00 | $600.00 - $525.00 = $75.00 | $225 |
| | | | | (10 hours) x ($22.50) = $225 | | | |
| 06/01/2020 not paid contractual rate or overtime | 5 days | 40 hours | 10 hours | (40 hours) x ($15.00) = $600 | $525.00 | $600.00 - $525.00 = $75.00 | $225 |
| | | | | (10 hours) x ($22.50) = $225 | | | |

| 06/08/2020 not paid contractual rate or overtime | Info not[226] available | 40 hours | 20 hours | (40 hours) x ($15.00) = $600 | $525.00 | $600.00 - $525.00 = $75.00 | $450 |
|---|---|---|---|---|---|---|---|
| | | | | (10 hours) x ($22.50) = $450 | | | |
| 06/15/2020 | 0.5 days | 5 hours | 0 hours | (5 hours) x ($15.00) = $75.00 | $42.50 | $75.00- $42.50 = $32.50 | $0 |
| 06/22/- 07/05/2020 | 5 days per week | 40 hours | 20 hours | (40 hours) x ($15.00) = $600 | $1,125.00 | $0 | $0 |
| | | | | (20 hours) x ($22.50) = $450 | | | |
| 07/13- 07/26/2020 not paid overtime | 5 days per week | 40 hours | 20 hours | (40 hours) x ($15.00) = $600 | $850.00 | $0 | $450.00 – ($850.00 - $600) = $200.00 |
| | | | | (20 hours) x ($22.50) = $450 | | | |
| 07/27/- 08/09/2020 | 5 days per week | 40 hours | 20 hours | (40 hours) x ($15.00) = $600 | $875.00 | $0 | $450.00 – ($875.00 - $600.00) = $175.00 |
| | | | | (20 hours) x ($22.50) = $450 | | | |
| 08/10- 08/23/2020 | 5 days per week | 40 hours | 20 hours | (40 hours) x ($15.00) = $600 | $510.00 | $90.00 | $450.00 |
| | | | | (20 hours) x ($22.50) = $450 | | | |
| 08/24- 09/06/2020 | 5days per week | 40 hours | 20 hours | (40 hours) x ($15.00) = $600 | $425 | $175 | $450 |
| | | | | (20 hours) x ($22.50) = $450 | | | |

[226] For the weeks that Defendant provided no evidence of days worked, I rely on Sands's unrefuted testimony that he worked ten hours a day each weekday and Saturday while doing inside sales. *See* D.I. 81 p. 53:12-54:10.

Contract base pay owed: $1,327.50
Overtime compensation owed: $3,200.00
**TOTAL OWED:** $4,527.50

From the above analyses, I have found that Defendant breached its contract with Sands by failing to pay Sands $1,327.50 in base pay. For its breach of contract, Defendant owes Sands $1,327.50. Additionally, Defendant failed to pay Sands $3,200.00 in overtime compensation, thus violating the FLSA. For violating Section 207 of the FLSA, Defendant owes Sands $3,200.00 in unpaid overtime compensation.

Now, I turn to calculation of liquidated damages under the above Statutes. Both the DWPCA and the FLSA provide for liquidated damages.[227] Plaintiffs may recover liquidated damages under both statutes but may not cumulatively recover for the same violation.[228]

Defendant has not shown by plain and substantial proof that it's violation of the FLSA was in good faith or based on reasonable grounds; therefore, Defendant does not sidestep liquidated damages. In accordance with the applicable FLSA provisions, Plaintiffs may recover liquidated damages under the FLSA in an amount equal to the overtime compensation they are respectively owed.[229] For

---

[227] *See* 19 *Del. C.* § 1103(b); 29 U.S.C. § 216(b).
[228] *See Tri-County Growers, Inc.*, 747 F.2d at 130, (allowed plaintiffs to recover liquidated damages for defendant's separate violations under the FLSA and West Virginia's Wage Payment and Collection Act).
[229] 29 U.S.C. § 216(b).

Kenney, that is an additional $1367.50; for Gallucio, that is an additional $779.20; and for Sands, that is an additional $3,200.00.

Based on the above calculations, I have found that Defendant violated DWPCA Section 1107 for withholding Plaintiffs' wages. Under the DWPCA Section 1103(b), Plaintiffs can recover liquidated damages in one of two amounts, whichever amount is less. I have found that an amount equal to the unpaid wages owed to them under that Chapter is the lesser amount in this circumstance. Because Plaintiffs are already recovering liquidated damages under the FLSA for their overtime compensation, recovering additional overtime compensation under the DWPCA would amount to double recovery. Therefore, Kenney and Gallucio may recover liquidated damages under the DWPCA for their unpaid minimum wage and Sands may recover liquidated damages under the DWPCA for his unpaid base pay. For Kenney, that is an additional $192.50. For Gallucio, that is an additional $37.50. For Sands, that is an additional $1,327.50.

In addition to the above damages, Defendant owes Sands $950 for the work uniforms Defendant failed to reimburse Sands for.

Based on the above analysis and calculations, the following are the total damages Defendant owes to each Plaintiff: Kenney is owed $3120.00, Gallucio is owed $1633.40, and Sands is owed $10,005.00

As the Court has found that Defendant has violated either the FLSA[230], the DWPCA[231], and Delaware's Minimum Wage Act[232] as to each Plaintiff, these violations trigger a potential award for attorneys' fees. Plaintiffs shall submit a memorandum supporting their request for attorney's fees with the appropriate affidavit within 30 days of the date of this order. Defendant has 30 days to file a responsive memorandum. No reply memorandum shall be filed absent further order of the Court.

**IT IS SO ORDERED**.

*/s/ Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

cc:  File&ServeXpress

---

[230] 29 U.S.C. § 216(b).
[231] 19 *Del. C.* § 1113(c).
[232] 19 *Del. C.* § 911(a).